# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:21-CR-30059-RAL |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTIONS TO SUPPRESS |
| CONRAD GOOD VOICE, JR., | |
| Defendant. | |

In this child sexual abuse case, Conrad Good Voice, Jr. (Good Voice), seeks to exclude evidence officers garnered after entering the residence he cohabitated with others. But because (1) Good Voice agreed to the entry, (2) the homeowner validly consented to a search and seizure of items in the residence, and (3) warrants -- later issued for Good Voice's phone and social medial accounts – were (i) based on probable cause, (ii) not overbroad, and (iii) relied on in good-faith, Good Voice's suppression motions should be denied.

## BACKGROUND

At 10:14 a.m. on March 2, 2021, the Rosebud Indian Health Service (IHS) Hospital called the Rosebud Sioux Tribe Law Enforcement Services (RSTLES) and reported a possible sexual assault of twin nine-year-old girls. RSTLES Special Agent

Matthew Tucker and Officer Oliver Semans responded to the hospital and met with RaeLane Searby, the aunt and guardian of both girls, A.D. and A.K.

Searby, who lived in a home with Good Voice, the twins, and her adult sister, informed Tucker the girls had told her that Good Voice "had put his private part by their butts." Searby though remarked that A.K. might be lying and that Good Voice would never do something like that. Despite her hesitancy on the matter, after talking with Tucker, Searby took A.D. and A.K. to the Central South Dakota Child Assessment Center (CSDCAC) in Pierre to be interviewed and medically evaluated.

There, FBI Special Agents Benjamin Plante and Jordan Carlson observed the child forensic interviews via closed circuit video. During the interviews, A.D. and A.K. revealed that Good Voice had penetrated them anally and vaginally, with one incident (against A.K.) occurring just the day before. Medical exams, conducted by a pediatric nurse practitioner, showed injuries consistent with A.D. and A.K.'s disclosures. Plante advised Tucker of what the girls said and their exam results.

In response, Tucker called RSTLES Officer Gerald Dillon and asked him to go to Good Voice's residence, arrest Good Voice, and hold the scene until Tucker arrived. Dillon and RSTLES Officer Drury Cook went to the home and knocked on the front door. Good Voice opened the door, and the following conversation ensued:

Dillon: Hello.

Good Voice: Hello.

Dillon: What's your name?

Good Voice: Conrad.

Dillon: Conrad?

Good Voice: Yup.

Dillon: Is there anyone else home with you?

Good Voice: Um, just my son.

Dillon: Just your son? Ok. Do you mind if I come in for a minute?

Good Voice: N-no.[1]

Dillon: Okay.

At that point, Good Voice turned around, stepped back and away from the open door, and stood in the living room as officers entered.

Once inside, Dillon asked how old the child was and whether anyone else was in the home. Good Voice stated that his son was three, and that nobody else was present. Dillon informed Good Voice that he needed to run outside to grab his phone, but that he would leave Cook in the home and would explain why officers were there when he came back. Good Voice agreed, and Dillon headed outside to his vehicle to let Tucker know about the presence of the child. Dillon gave Tucker a status update and returned to the living room.

---

[1] *See* Mot. Hr'g Ex. 7 at 00:52--05:40. (Mar. 15, 2022) (although the exact reply is hard to discern, the permissive thrust of the response is clear, especially given the subsequent interaction in the home).

While Good Voice sat on a couch watching Captain America, Dillon inquired about the child's mother and learned that she was currently in Pierre. He also let Good Voice know that a special agent (Tucker) was en route and wanted to speak with Good Voice. Dillon then collected some biographical information on the child and went back outside. From his vehicle, Dillon called the South Dakota Department of Social Services (DSS) and requested assistance with Good Voice's son.

Tucker pulled up to the house a short time later (around 15 minutes after the initial door knock). Together, he and Dillon waited about 20 more minutes for the social worker, Megan Hawthorn, to reach the home. Upon her arrival, Tucker and Dillon re-entered the residence and arrested Good Voice. Cook transported Good Voice to the Rosebud Adult Correctional Facility (RSTACF) where Good Voice was held on tribal assault, sexual abuse, and child abuse charges.

Concurrently, Searby (the homeowner) signed a consent to search form, authorizing FBI agents to carry out a "complete search" of her Sicangu Village home and to "take any items which they determine may be related to their investigation." Having received Searby's permission to search, Plante made his way down from Pierre to the home. As Plante drove, Carlson called and informed him that A.D. made comments about Good Voice using the flashlight of a phone to look at her "private parts."

Plante searched the residence and seized several items. Among them was a black cell phone in the bedroom he shared with Searby. Following the search, Plante and

Tucker met with Good Voice, but Good Voice chose not to answer questions or provide a DNA sample.

A.D. returned to CSDCAC on March 9, 2021 for another interview. Plante arranged the interview because he wanted A.D. to clarify some of her earlier statements. In conversations with the interviewer, Angela Lisburg, A.D. recalled being stomach down on a bed in the home with Good Voice on top of her. According to A.D., Good Voice got up, took his black phone off a charger next to him, kneeled behind her, and pointed the flashlight toward her "private part" for "a couple seconds" or "like half a minute." After using the phone, A.D. said, Good Voice plugged it back in while still laying on her.

When Lisburg asked whether Good Voice would ever "do like, pictures or videos" with his phone, A.D. answered, "hm-mm" (negative). After Lisburg confirmed that was a "nope," A.D. explained, "Cause, I don't hear the um, clicking um, like when he's taking the picture." Lisburg replied, "I see. So you see the flashlight light, but you don't hear the clicking sound?" A.D. responded, "mm-hmm" (affirmative).

Using this and other information, Plante applied for, and received, a warrant to search the phone that officers seized during their search of the residence. Examination of the phone led to more information and, in turn, to search warrant applications for Good Voice's Facebook and Snapchat accounts. A federal magistrate judge found that probable cause existed and granted the corresponding warrants.

On June 8, 2021, a federal grand jury indicted Good Voice on two counts of Aggravated Sexual Abuse of a Child, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2). Good Voice now moves to suppress (1) statements he made during and after his arrest and (2) evidence obtained from his phone and social media accounts.[2] The government opposes these motions.[3]

## DISCUSSION

### A. The Home

### 1. Consent to Enter

Good Voice first claims that Dillon entered the home and arrested him without a warrant or consent and therefore "all statements made by [him] inside the home" are fruit of the poisonous tree.[4] He also specifically contests the voluntary nature of any consent, asserting that he "did not voluntarily acquiesce to the officers' entry."[5]

The Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."[6] "Without consent or exigency, or an arrest warrant for a resident, the police generally

---

[2] Docket Nos. 48, 53.

[3] Docket Nos. 50, 57.

[4] Docket No. 49 at 4-5.

[5] *Id.*

[6] *Payton v. New York*, 445 U.S. 573, 576 (1980).

must have a search warrant to enter a home."[7] But when police have "valid and voluntary consent" to enter, they may make a warrantless in-home arrest.[8] Consent may be either express or implied.[9] Implied consent is established when an occupant willingly allows, by words and action and without objection, officers to enter the residence.[10] A reviewing court must look to the totality of the circumstances to determine whether consent was given voluntarily or was the product of duress or coercion.[11]

The issue here is not whether Good Voice subjectively consented (he claims he did not); but whether his conduct would have caused a reasonable officer to believe he

---

[7] *United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010).

[8] *United States v. Briley*, 726 F.2d 1301, 1303 (8th Cir. 1984).

[9] *See United States v. Faler*, 832 F.3d 849, 853 (8th Cir. 2016) (stating that officers may enter a home with voluntary implicit or explicit consent).

[10] *Id.; see also United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016) (finding an invitation to enter when, without words or protest, occupant opened door wider and walked inside with back to officers after an officer asked to come inside).

[11] *United States v. Yeager*, 731 F. App'x 545, 547 (8th Cir. 2018).

consented to the entry of the residence.[12] Dillon's body-camera recording,[13] establishes Good Voice's actions fostered just such a reasonable belief.[14]

Dillon knocked, possibly placed his foot alongside the front door, and soon after, Good Voice opened the door.[15] In a conversational tone, Dillon asked Good Voice for his name and whether anyone else was home.[16] Good Voice identified himself, and told Dillon that his son was present.[17] Dillon inquired whether it was just the boy inside and then asked if he could come in for a minute.[18] Good Voice's exact response is difficult to make out in the recording, but the Court's interpretation, similar to Dillon's,[19] is that it

---

[12] *See Rodriguez*, 834 F.3d at 940 ("the ultimate inquiry is not whether the defendant subjectively consented, but whether 'a reasonable officer would believe consent was given.'").

[13] *See* Mot. Hrg. Ex. 6 at 00:43–05:30.

[14] *See Rodriguez*, 834 F.3d at 940; *United States v. White Horse*, 3:20-CR-30058(01)-RAL, 2021 WL 784871, at *5 (D.S.D. Feb. 11, 2021), *R&R adopted*, 2021 WL 781798 (D.S.D. Mar. 1, 2021).

[15] *See* Mot. Hrg. Ex. 6 at 00:43–00:53.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *See* Mot. Hr'g Tr. 55 (Mar. 15, 2022) ("Q. What did you understand Mr. Good Voice to say? A. I understood him to say no, huh-uh or no, he doesn't mind and then step back and held the door open.").

was like "N-no" or "Nuh-uh." If so, that would constitute express oral consent to enter.[20]

But even if Good Voice's response was not an explicit invitation to enter, his nonverbal actions, at the doorway and afterward, engendered apparent consent and gave officers reason to believe they had permission to enter.[21] In response to Good Voice's answer, Dillon said "Ok," and proceeded into the residence as Good Voice casually retreated from the open door and walked toward a preschooler seated on a nearby couch in the living room.[22] The Eighth Circuit has held that similar conduct amounted to implied consent.[23]

Moreover, at no point in any of the recordings did Good Voice, an adult who appeared rational and fully aware, object to the entry or Cook's remaining in the

---

[20] *United States v. Alloway*, 25 F.4th 1093, 1096 (8th Cir. 2022) (finding express oral consent to enter allowed officers to enter home without warrant).

[21] *See* Mot. Hr'g Tr. 61 ("The way this word "no" was used was more – I felt invited, I mean, he stepped back -- … held the door open for me, I took it as come on in").

[22] *See* Mot. Hr'g Ex. 6 at 00:53-01:00; Mot. Hr'g Tr. 61 ("I felt invited, stepped back, held the door open for me, I took it as come on in.").

[23] *See Rodriguez*, 834 F.3d at 941 (opening screen door wider, turning and walking aside, after officer asked to come inside and talk amounted to implied consent); *Faler*, 832 F.3rd at 853 (stepping aside, after officers asked if they could come in, was implied consent); *Greer*, 607 F.3d at 563 ("[W]hen [defendant] opened the door to the porch and stepped back, he impliedly invited the officers to enter."); *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) ("[T]he action of [defendant] in the opening of the door and stepping back constituted an implied invitation to enter.").

home.[24] Nor did Good Voice do anything that could be construed as either denying or retracting consent to enter such as asking officers to leave, closing the door, or showing disapproval of their presence. And there is no evidence that officers coerced consent from Good Voice by intimidation, force, or trickery.

Officers were reasonable in their belief that Good Voice consented to their entry. His consent, whether it be express or implied, was likewise voluntary under the totality of the circumstances.[25] The warrantless entry into the house thus did not violate the Fourth Amendment.

The ensuing arrest, like the entry, was also proper. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."[26] The Rosebud Sioux Tribe Law and Order Code (RSTLOC) § 5-7-1 provides that:

> Any person who knowingly causes another person to engage in a sexual act:
> (1)     By using coercion or force against that other person;
> (2)     By threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping;
> (3)     When the other person has not attained the age of 12 years;

---

[24] *See* Mot. Hr'g Ex. 6 at 00:53-05:30; Mot. Hr'g Ex. 8 at 00:00-02:04; Mot. Hr'g Tr. 61 ("Q. … [D]id the Defendant say or do anything that made you think that he did not consent to you and Officer Cook waiting in the residence for Agent Tucker to arrive? A. No[.]").

[25] *See United States v. Ortega-Montalvo*, 850 F.3d 429, 433 (8th Cir. 2017) (examining the totality of the circumstances and finding voluntary consent to enter).

[26] *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

is guilty of aggravated sexual abuse.

Aggravated Sexual Abuse is a Class A Crime. [27]

A "sexual act" consists of sexual penetration or "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the

age of 16 years …"[28] Under the Tribe's Rules of Criminal Procedure:

> Any officer authorized to make arrests on the Rosebud Reservation may, without a warrant, arrest a person for any offense committed in the presence of the officer or may, upon probable cause that a Class A crime has been committed and that the person arrested committed it, arrest that person although the offense was not committed in the presence of the officer.[29]

"Probable cause exists to make a warrantless arrest when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."[30] Given A.D. and A.K.'s disclosures of penetrative sexual acts and the corroborating medical exams,

---

[27] *See* Mot. Hr'g Ex. 3 at 3-4.

[28] *Id.* at 6- 7 (§ 5-7-14(2)).

[29] *Id.* at 10 (§ IV (B) (6)).

[30] *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1009 (8th Cir. 2017) (cleaned up).

officers had sufficient probable cause to believe Good Voice violated RSTLOC § 5-7-1 and could arrest him without a warrant.

## 2. Consent to Search

Good Voice also attacks Searby's consent to search the home in his absence.[31] With nary a case citation to back him up, he claims the third-party consent form Searby signed was overbroad and failed to specify the items officers could seize.[32] He further maintains that his absence and inability to object to the search of the shared rooms was because officers illegally entered the residence and arrested him.[33]

While one person's consent of a jointly occupied home is generally enough to justify a warrantless entry or search, there is a narrow exception to this rule. A "physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."[34] The rule, however, is limited to situations in which the objecting occupant is present.[35] So for consent to be vitiated, the complaining occupant must be personally present unless

---

[31] Docket No. 49 at 5.

[32] *Id.*

[33] *Id.* at 6.

[34] *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006).

[35] *See Fernandez v. California*, 571 U.S. 292, 301 (2014).

"there is evidence that the police have removed [him or her] from the entrance for the sake of avoiding possible objection."[36]

As already discussed, Good Voice was not physically present to oppose the search after officers lawfully arrested him on tribal charges. No evidence was presented that he was arrested "for the sake of avoiding a possible objection" to the search.[37] He therefore does not fall within the narrow exemption that might otherwise counter Searby's unopposed consent.

As for the scope of that consent, a person "may of course delimit as he chooses the scope of the search to which he consents."[38] When one "provides general consent to search, only an act clearly inconsistent with the search, an unambiguous statement, or a combination of both will limit the consent."[39] The scope of any consent given is considered under an objective reasonableness standard: "what would the typical reasonable person have understood" from the exchange between officers and the consenting party?[40]

---

[36]*Id.* at 302 (*quoting Randolph*, 547 U.S. at 121).

[37]*See United States v. Brewer*, 588 F.3d 1165, 1169-70 (8th Cir. 2009) (removal of defendant before seeking consent to search from his wife not "for the sake of avoiding a possible objection").

[38] *Florida v. Jimeno*, 500 U.S. 248, 252 (1991).

[39] *United States v. Beckmann*, 786 F.3d 672, 679 (8th Cir. 2015).

[40] *Jimeno*, 500 U.S. at 251.

Here, in the context of an investigation into the alleged sexual abuse of minor family members living in her home, Searby agreed in writing to allow FBI agents to carry out a "complete search" of her home and "take any items" which they thought may be "related" to the investigation.[41] Such a consent was within her powers as the owner and co-occupant of the home,[42] and agents did not exceed the range of the consent given to them when they seized items pertinent to their sexual assault investigation.[43]

And Searby's consent was voluntary. Determining voluntariness of a consent to search is a fact intensive process that considers the totality of the circumstances.[44] Searby brought the twins to CSDCAC, and there is no evidence that she was in any way impaired. When Searby had issues with Plante, she requested to talk with another FBI

---

[41] Mot. Hr'g Ex. 11; *see also* Mot. Hr'g Tr. 68 ("Q. Did she say anything when you met with her that in any way limited the scope of the search …? A. No.").

[42] *See Fernandez,* 571 U.S. at 294, 296, 299 (occupant could provide consent (both oral and written) to search apartment after defendant's arrest); *United States v. Nichols,* 574 F.3d 633, 636 (8th Cir. 2009) ("The Fourth Amendment permits, however, a valid warrantless search of a premises when officers obtain the voluntary consent of an occupant who shares authority over the area in common.").

[43] *See United States v Berger,* 823 F.3d 1174, 1176, 1178-79 (8th Cir. 2016) (scope of written consent to search home extended to forensic examination of hard drive); *United States v. Starr,* 533 F.3d 985, 996 (8th Cir. 2008) (police officers had unqualified written consent to search defendant's entire home); *United States v. Ware,* 890 F.2d 1008, 1010-12 (8th Cir. 1989) (preprinted consent form giving permission to conduct "complete search" of apartment).

[44] *United States v. Comstock,* 531 F.3d 667, 676-77 (8th Cir. 2008).

agent instead.[45] Carlson went to speak with Searby, brought the consent form to her, explained it, and witnessed her sign the same.[46] She affirmed, with her signature, that the permission to search – she gave to agents – was voluntary.[47] Carlson, a witness the Court found credible, testified that "[Searby] was pleasant with me, but I went in kind of overly cautious since I knew she had gotten upset with Agent Plante so I was overly pleasant with her."[48] On this record, Searby's consent was not overbroad and made voluntarily.

### 3. Fruit of the Poisonous Tree

Good Voice makes various fruit of the poisonous tree arguments.[49] But none of them have merit because officers did nothing wrong. Without a poisonous tree to grow from, there is no fruit to exclude.

### B. The Warrants

---

[45] *See* Mot. Hr'g Tr. 66 ("Q. She told him she wouldn't consent to him, but she would consent to another agent? A. Correct.").

[46] *See id.* at 64 ([Carlson]:"So I went into a room where there – [Searby] was sitting and I explained the [ ] consent form was a consent for her residence [ ] – which was already filled out by Agent Plante. So I explained the form to her, I read the form, I confirmed that [the] address was her address and then asked her if she had any questions. She said she didn't. She signed the form and then I signed the form and dated it.").

[47]*See* Mot. Hr'g Ex. 11, ¶ 3.

[48] Mot. Hr'g Tr. 68.

[49] Docket No. 49.

## 1. Phone

Good Voice challenges the search warrant for his phone on probable cause grounds. He claims Plante's statement in the warrant affidavit that A.D. "did not think" Good Voice took pictures with the phone was inaccurate. He insists that A.D. answered "no" or a negative "uh-uh" when questioned about Good Voice's picture-taking and that there is a meaningful difference between Plante's characterization of A.D.'s response and what she actually said.[50] Good Voice also contends that there was insufficient evidence that he photographed A.D. to justify the issuance of a phone warrant.[51] The Court disagrees and upholds the warrant.

"If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established."[52] "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge should be paid great deference by reviewing courts."[53] The examination of the affidavit's sufficiency involves a "common sense," not a "hyper-

---

[50] *Id.* at 6.

[51] *Id.*

[52] *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (cleaned up).

[53] *Id.* (cleaned up).

technical" approach.[54] But a search warrant must be voided and the fruits of the search suppressed if a defendant proves by a preponderance of the evidence that (1) the subscribing officer knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit, and (2) without the statement, the affidavit would not have established probable cause.[55]

In the March 2 interview, A.D. responded "No," when asked if Good Voice took pictures of her, but also stated that Good Voice shined his phone's flashlight on her "private part" or her "butt" and did so "about five times."[56] Seven days later, during the second interview, A.D. disclosed that Good Voice would (1) be "on top" of her while she was on a bed,[57] (2) get off her, grab his black phone from the charger, and kneel behind her,[58] and (3) illuminate the phone's flashlight on her "private part," before returning it to the charger, and "continue being on top" of her.[59] Lisburg, the interviewer, then delved further:

---

[54] *Id.*

[55] *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Neal*, 528 F.3d 1069, 1072 (8th Cir. 2008).

[56] Mot. Hr'g Ex. A at 54:35-56:00.

[57] Mot. Hr'g Tr. 99-100 (Plante's testimony that he arranged the interview to clarify A.D.'s statements about the phone flashlight).

[58] Mot. Hr'g Ex. 16 at 03:03-08:11.

[59] Mot. Hr'g Ex. 16 at 03:03-08:11.

Lisburg: Would Uncle Conrad ever do like, pictures or videos with his black iPhone?

A.D.: Hm-mm.

Lisburg: Nope? Okay. Okay.

A.D.: 'Cause I don't hear the um, clicking um, like when he's taking the picture.

Lisburg: I see. So you see the flashlight light, but you don't hear the clicking sound?

A.D.: Mm-hmm.[60]

Plante included statements in his search warrant affidavit about what A.D. told Lisburg:

> During [A.D.'s] forensic interview on March 2, 2021, [A.D.] disclosed that the incidents with Conrad began about two years ago. On March 9, 2021, [A.D.] was further forensically interviewed at the CSDCAC in Pierre, South Dakota. [A.D.] disclosed that Conrad would be on top of her on the bed before he would grab a black phone, a phone that kind of looked like an iPhone, from a charger, turn on the flashlight, and look at her private part. Conrad held the phone while on his knees, and [A.D.] did not know why he used the flashlight. [A.D.] further disclosed that after using the phone a little bit he would put the phone back on the charger and continue being on top of her. [A.D.] disclosed that this happened on approximately five different occasions. According to [A.D.], she did not think Conrad was taking pictures or videos with the phone because she did not hear a clicking sound.[61]

Given A.D.'s explanation for why she did not think pictures or videos were taken (the lack of an audible sound), Plante's summation was in no way misleading or inaccurate. Apart from Good Voice's qualms with the framing of A.D.'s response to the

---

[60] *Id.* at 09:33-09:51.

[61] Mot. Hr'g Ex. 18 at 5, ¶ 13.

photograph question, he identifies no false statements made intentionally or recklessly that might present a valid suppression issue.[62]

Further, the rest of the affidavit solidified a finding of probable cause for a warrant to search the phone. Among other information, Plante provided an overview of A.D. and A.K's comments at IHS and during their CSDCAC interviews where they described Good Voice engaging in sex acts with them in the house.[63] Plante also related that he and Tucker located a black phone, with Good Voice's name on it, in plain sight in a bedroom Searby and Good Voice shared, and that Searby had confirmed the phone belonged to Good Voice.[64] What's more, Plante stated how, based on his own knowledge and experience, cellular phones could contain information or communications related to the sexual abuse offenses.[65]

In toto, Plante alleged sufficient facts to lead a prudent person to believe there was a fair probability that contraband or evidence of a crime would be found on Good Voice's phone. And Plante neither intentionally nor recklessly misrepresented those

---

[62] *See United States v. Gonzalez*, 781 F.3d 422, 431 (8th Cir. 2015) ("To receive a *Franks* hearing, a defendant must make 'a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'").

[63] Mot. Hr'g Ex. 18 at 3-5, ¶¶ 7-10, 13.

[64] *Id.* at 4-5, 12, ¶¶ 13, 15 and Attachment A.

[65] *Id.* at 5-6, ¶¶ 16-18.

facts to the magistrate judge. Good Voice cannot succeed on his lack of probable cause –

for a phone warrant-- claim.

## 2. Snapchat

In a separate motion, Good Voice asserts that the affidavit and resulting warrant-- to search his Snapchat account-- were not supported by probable cause, were overbroad, and lacked particularity.[66] But the warrant and affidavit had a proper foundation of facts, described what was to be searched and seized with sufficient particularly, and were limited in scope by Section II of the incorporated Attachment B.[67]

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[68] "To satisfy the particularity requirement … the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized."[69] "The degree of specificity required will depend on the circumstances of the case and on the type of items involved."[70] "This

---

[66] Docket No. 54 at 3-4.

[67] Mot. Hr'g Exs. 22-23.

[68] U.S. CONST. amend. IV.

[69] *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014) (quotation and citation omitted).

[70] *Id.* (quotation and citation omitted).

particularity standard is one of practical accuracy rather than of hypertechnicality."[71] "The Fourth Amendment requires particularity in the warrant, not supporting documents like an application or affidavit."[72]

Plante's affidavit adequately set "forth sufficient facts to lead a prudent person to believe [ ] there [was] a fair probability that contraband or evidence" of the crime would be found in Good Voice's Snapchat account.[73] The affidavit detailed, among other things, information from the CSDCAC interviews, validation of the phone's owner, and data found on the phone itself such as screenshots of Snapchat conversations relevant to the sexual abuse accusations.[74] Altogether, there was sufficient probable cause to support a warrant for Good Voice's Snapchat account.

The warrant satisfies the particularity requirement as well and was not overbroad. Attachment A identified Good Voice's account, Attachment B, Section I set forth in the range of information sought, and Attachment B, Section II narrowed the scope of the search to "All information described … in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1153 and 2241(c), for the

---

[71] *Id.* (quotation and citation omitted).

[72] *Id.*

[73] *See* Mot. Hr'g Ex. 22 at 2-9; *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (cleaned up).

[74] *See* Mot. Hr'g Ex. 22 at 2-9.

period of February 1, 2021 through March 16, 2021" from the account.[75] The Eighth Circuit has repeatedly found that the sort of limiting language included in Section II satisfies the particularity requirement.[76] The Snapchat warrant was sufficiently limited in scope and breadth to comply with the Fourth Amendment.[77]

Yet assuming (for the sake of argument) that one or more of Good Voice's assertions are correct, his motion still fails under *Leon*.[78] Officers acted with an objectively reasonable belief that the warrant, for the Snapchat account, was legitimate and enforceable.[79] They should not be penalized for acting in good-faith.[80]

---

[75] *See* Mot. Hr'g Ex. 23 at 3-5.

[76] *See United States v. Sherman*, 372 F. App'x 668, 676 (8th Cir. 2010) (warrant tying information sought to specific crime was not overbroad); *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008) (warrant contained "a specific limitation" that was tailored to items relevant to charge); *United States v. Gleich*, 397 F.3d 608, 612 (8th Cir. 2005) (warrants satisfied particularity requirement because language in them limited search to "items specifically prohibited by statute"); *see also United States v. Jones*, No. 19-cr-341, 2021 WL 1321270, at **11-12 (D. Minn. Jan. 7, 2021) (warrant authorizing search of Facebook account was not overbroad).

[77] *See United States v. Young*, No. 21-cr-00098-BLW, 2021 WL 5889526, at **2-4 (D. Idaho Dec. 13, 2021) (probable cause existed for issuance of warrant to search Snapchat account and warrant was not overbroad); *United States v. Woods*, No. 17-CR-103V, 2019 WL 7630758, at ** 2-4 (W.D. N.Y. Aug. 30, 2019) (Snapchat warrant was sufficiently particular to comply with Fourth Amendment).

[78] *See United States v. Leon*, 468 U.S. 897 (1984).

[79] *See United States v. Beasley*, No. 20-cr-162-pp, 2022 WL 203391, at *7 (E.D. Wis. Jan. 24, 2022) (court would deny motion to suppress evidence obtained from Snapchat accounts under good-faith exception even if it agreed with defendant's contentions).

Good Voice also asks this Court to suppress records that Snapchat provided to the government which were outside the purview of the warrant.[81] He does not, however, cite any authority to support his request.[82] If Good Voice believes Snapchat wronged him -- by providing more of information to the government than the warrant required – then it would seem to be a matter he should address in a civil context, not this one.

### 3. Facebook

Finally, Good Voice claims that the Facebook affidavit and search warrant lacked particularity, were too broad, and went beyond what their probable cause allowed for.[83] But the warrant for the Facebook account included limiting language in Attachment B, Section II that sufficiently confined the warrant so that it did not run afoul with the Fourth Amendment. It was also reasonable to believe that the account might have more information than solely the Searby messages.[84]

---

[80] *See Leon*, 468 U.S. at 921 ("Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.").

[81] Docket No. 54 at 4.

[82] *Id.*

[83] Docket No. 54 at 4-5.

[84] *See* Mot. Hr'g Exs. 20, 21.

Just as with the Snapchat warrant, the Facebook warrant identified Good Voice's account in Attachment A, listed the spectrum of information to be seized in Attachment B, Section I, and then, in Section II, restricted the search to "all information described [ ] in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1153 and 2241(c), for the period of February 1, 2021 through March 16, 2021[.]"[85] The circumscribed time window and subject matter restriction of the warrant precluded any sort of general rummaging and curbed officers' ability to search for and seize unrelated things.[86]

And the probable cause showing, in Plante's affidavit, was enough for a judicial officer to conclude that the Facebook account could contain information beyond just Searby's messages, such as Good Voice's location at relevant times and whether other messages had been altered or deleted after the investigation began.

At any rate, even if the Facebook search warrant was not particular enough, overbroad, or otherwise legally insufficient, the warrant was not "so lacking in indicia of probable cause" or "facially deficient" that no officer could reasonably presume it to

---

[85] *See United States v. Burkhow*, No. 19-CR-59-CJW-MAR, 2020 WL 589536, at *9 (N.D. Iowa Feb. 6, 2020) (discussing the wide array of cases that consider the effect of limiting a Facebook search warrant to the relevant time range or offense being investigated).

[86] *See United States v. Jones*, No. 19-CR-341 (NEB/LIB), 2021 WL 960910, at *4 (D. Minn. March 15, 2021) (Facebook account warrant was sufficiently particular because it identified specific categories of information for one charged offense and was only for a 14-month period).

24

be valid.[87] Contrary to what Good Voice maintains, the good-faith exception to the warrant requirement applies to the evidence seized from Facebook and any such evidence may be used against him at trial.[88]

## CONCLUSION

Despite Good Voice's protestations, officers acted within the bounds of the law when they arrested him and searched his phone and social media accounts. Officers reasonably believed they had consent to enter Searby's residence and probable cause to arrest Good Voice for the commission of a Class A tribal offense. They also had Searby's consent to search the home and seize items in it they considered germane to their investigation. Plante's warrant affidavits, prepared after the house search, were not false or misleading. And the search warrants based on them—for the phone and social media accounts-- were predicated upon a proper showing of probable cause and were not unduly broad. Anyway, officers' reliance-- on the warrants being properly issued--

---

[87]*Leon*, 468 U.S. at 922-23, 926; *cf. Massachusetts v. Sheppard*, 468 U.S. 981, 988-91 (1984).

[88]*See United States v. Harris*, No. 20-CR-98 (SRN/TNL), 2021 WL 3929270, at **3-7 (D. Minn. Sept 2, 2021) (without ruling on whether warrant meets Fourth Amendment particularity requirement and assuming – but not deciding—warrant was too broad, good-faith exception applies to evidence seized from Facebook account); *Burkhow*, 2020 WL 589536, at **11-12 (despite the lack of temporal constraints—making the Facebook warrants being overbroad—*Leon* good-faith exception applies, making suppression inappropriate).

was objectively reasonable, and application of the extreme sanction of exclusion here is uncalled for.

## RECOMMENDATION

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Good Voice's Motions to Suppress[89] be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[90] Unless an extension of time for cause is later obtained,[91] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[92] Objections must "identify[] those issues on which further review is desired[.]"[93]

Dated this 7th day of April, 2022, at Pierre, South Dakota.

---

[89]*See* Docket Nos. 48, 53.

[90]*See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[91]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[92]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[93]*Arn*, 474 U.S. at 155.

**BY THE COURT:**

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE