UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CONRAD GOOD VOICE JR.,<br><br>Defendant. | 3:21-CR-30059-RAL<br><br><br>OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTIONS TO SUPPRESS |

Defendant Conrad Good Voice, Jr. ("Good Voice"), filed two motions to suppress asserting his Fourth Amendment rights were violated when law enforcement entered the home where he was living to arrest him and seized certain items including a cell phone. In addition to arguing that the content on the cell phone should be suppressed, Good Voice contends the illegality of the search and detention taints any statements he subsequently made to law enforcement and to others on the phone while in custody and therefore should be suppressed. Good Voice also challenges whether law enforcement exceeded the breadth of the search warrants when they seized communications associated with Good Voice's Snapchat and Facebook accounts. For the reasons stated below, this Court denies Good Voice's motions to suppress.

**I. Facts Relating to Motions to Suppress**

On June 6, 2021, Good Voice was indicted on two counts of aggravated sexual abuse of a child in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2), against two children[1] who had not attained the age of twelve.[2] Doc. 1. The indictment stems from an investigation that was initiated on March 2, 2021, when RaeLane Searby ("Searby"), the children's aunt and guardian, took them to the Rosebud Indian Health Services Hospital ("IHS") after the two children had reported to her that they had been sexually abused by Good Voice. T. 15–16. Searby and Good Voice were in a relationship together and shared a bedroom. T. 76. IHS alerted Rosebud Sioux Tribe Law Enforcement Services ("RSTLES") which sent RSTLES Special Agent Matthew Tucker ("Tucker") to investigate. T. 15–16.

At IHS, Searby met with Tucker and informed him that the girls had told her that Good Voice "had put his private part by their butts." Ex. 2, T. 16. Searby told Tucker that A.K. might be lying in an effort to get back with her mother and that she believed Good Voice "would never do anything like that." Ex. 2, T. 16, 30–31. Tucker advised Searby that physical exams and interviews with the children would need to be conducted in Pierre, South Dakota. Ex. 2, T. 17–18, Ex 2. Searby transported the children to the Central South Dakota Child Assessment Center ("CSDCAC") in Pierre to be interviewed and medically evaluated. Ex. 2.

There, FBI Special Agents Benjamin Plante[3] ("Plante") and Jordan Carlson ("Carlson") observed the child forensic interviews via closed circuit video. Ex. 2, T. 75, 115. During the

---

[1] The two victims are twin sisters with the same initials. For clarity, this Court will use the same initials used during the suppression hearing and will use A.D. to refer to alleged victim one and A.K. to refer to alleged victim two. T. 16–17.

[2] The alleged two victims were nine years old at the time they made statements regarding the alleged sexual abuse. T. 16.

[3] Plante observed all of A.K's interview but left during A.D.'s interview to search the home. T. 77, 115. Carlson watched the entire interview and later alerted Plante that A.D. had said that Good Voice had used a flashlight on his phone to look at her "private parts." T. 115.

interviews, A.D. and A.K. described Good Voice committing sexual acts including oral, anal and vaginal penetration. Exs. 2, 18 at 4–5, T. 18, 75. A.D. said that Good Voice used a flashlight on his phone to look at her private parts. T. 82–83. A.K. reported one sexual incident occurring just the day before, while A.D. reported she had last been abused the week prior. Ex. 18 at 4, T. 18, 75. A.D. claimed the abuse had been ongoing for two years. Exs. A, B at 43. The assessments concluded that the physical injuries present were consistent with and supported the disclosures by A.D. and A.K. Ex. 2, T. 18, 76–77, 85–86. Plante called Tucker and advised him what the girls had said and the results of the physical examinations. Ex. 2, T. 18, 76–77, 81.

Tucker made contact by phone with RSTLES Officer Gerald Dillon ("Dillon") and asked him to arrest Good Voice for aggravated sexual abuse based on the probable cause they had ascertained and to secure the scene until Tucker arrived. T. 18-19, 38, 51–52. Dillon and RSTLES Officer Drury Cook ("Cook") went to the home and Dillon knocked on the front door.[4] T. 52. Good Voice opened the door, and the following conversation took place, recorded on Officer Dillon's body camera:

>  Dillon: Hello.
>
>  Good Voice: Hello.
>
>  Dillon: What's your name?
>
>  Good Voice: Conrad
>
>  Dillon: Conrad?
>
>  Good Voice: Yup

---

[4] Good Voice asserts Dillon placed his foot on the doorframe to block Good Voice from potentially closing the door on him. The motions hearing and body camera footage leave it unclear whether this occurred; Dillon appears to shift his body away from the ajar screen door he is holding open as a vehicle approaches before Good Voice opens the inside door to the home. Ex. 6.

> Dillon: Is there anyone else home with you?
>
> Good Voice: Um, just my son.
>
> Dillon: Just your son? Ok, do you mind if I come in for a minute?
>
> Good Voice: N—no.[5]
>
> Dillon: Okay.

Ex. 6. Good Voice proceeded to turn around, stepping back into the living room and away from the open door toward his toddler-aged son sitting on a couch as Dillon entered the home. Ex. 6. Once inside the home, Dillon asked how old the child was and again asked Good Voice whether anyone else was in the home. Ex. 6, T. 39. Dillon then informed Good Voice that he needed to leave the residence to grab his phone, but that he would leave Cook in the home. Ex. 6, T. 40, 51. Dillon headed outside to his vehicle to let Tucker know about the presence of the child. Ex. 6, T. 40. After Dillon gave Tucker a status update, he returned to the living room before again leaving and waiting for Tucker to arrive outside. Ex. 6, T. 40. While inside, Dillon asked Good Voice several biographical questions and told Good Voice a special agent was on his way to speak with him about an investigation. Ex. 6, T. 39–41. Good Voice remained compliant during this time and answered the officer's questions. Ex. 6. The body camera footage shows Good Voice sitting on the couch watching television. Ex. 6.

While waiting for Tucker, Dillon made contact with the South Dakota Department of Social Services ("DSS") about the presence of the child and DSS arranged for a social worker, Megan Hawthorn ("Hawthorn"), to travel to the residence from Valentine, Nebraska. T. 20, 40–

---

[5] See Ex. 6 at 00:00-05:40. (Mar. 15, 2022) (as the Magistrate Judge notated in the Report and Recommendation, Doc. 79, the precise reply from Good Voice is difficult to discern although it seems to be "No." However, this Court agrees with the Report and Recommendation that the permissive thrust of the response is clear, especially given the subsequent interaction in the home).

41, 47–48. Tucker arrived at the home a short time later (about 15 minutes after the initial door knock). Ex. 6. Tucker and Dillon waited about 20 minutes for Hawthorn to reach the home. Exs. 6, 8, T. 20–21. Upon Hawthorn's arrival, Tucker and Dillon entered the residence and arrested Good Voice. Exs. 2, 8, T. 20–21, 41. Law enforcement transported Good Voice to the Rosebud Sioux Tribe Adult Correctional Facility ("RSTACF") where Good Voice was held on tribal assault, sexual abuse, and child abuse charges. T. 41.

During this same period of time, FBI Special Agent Carlson asked Searby (who owned the home, T. 76) to sign a consent to search form, which she did, authorizing FBI agents to carry out a "complete" search of her Sicangu Village home and to "take any items which they determine may be related to their investigation." T. 64–69, 87, Ex. 11. Plante drove from Pierre to the Sicangu Village home to conduct the search. T. 21, 77, 87. While in route, Carlson, who had continued watching the assessment interview with A.D. when Plante left to conduct the search, called and informed Plante that A.D. said Good Voice had used a flashlight on his phone to look at her private parts. T. 81-83, 92. Plante searched the residence and seized several items including a black cell phone in the bedroom Good Voice shared with Searby. T. 76-77, 89, 92, 94-97, 112, Ex. 12, 13. Following the search, Plante and Tucker met with Good Voice, but Good Voice chose not to answer any questions or provide a DNA buccal sample.[6] T. 33, 98.

A follow up interview with A.D. was conducted at CSDCAC on March 9, 2021. Exs. 16, 17, T. 98-100. Plante arranged the interview because he wanted A.D. to clarify some of her earlier statements. T. 99-100. During the interview, A.D. recalled being stomach down on a bed in the home with Good Voice on top of her. Ex. 16, T. 103. According to A.D., Good Voice got up,

---

[6] Law enforcement eventually did obtain a DNA sample from Good Voice via a search warrant. T. 98.

retrieved his black phone off a charger next to him, kneeled behind her, and pointed the flashlight toward her "private part" for "a couple seconds" or "like half a minute." Exs. 16, 17 at 6. After using the phone,[7] according to A.D., Good Voice plugged it back in and then continued to sexually assault her. Exs. 16, 17 at 6, T. 103.

When asked if Good Voice would ever take pictures or videos with his phone, A.D. answered "hm-mm" (negative). Exs. 16, 17 at 4–7, T. 101. After the interviewer confirmed the answer was a negative, A.D. explained "Cause, I don't hear the um, clicking um, like when he's taking the picture." Exs. 16, 17 at 7, T. 101. The interviewer replied, "I see. So you see the flashlight light, but you don't hear the clicking sound?" Exs. 16, 17 at 7, T. 101. A.D. responded "mm-hmm" (affirmative). Exs. 16, 17 at 7, T. 101.

Using this information, Plante applied for, and received, a warrant to search the phone that officers seized during their search of the Sicangu Village residence. Ex. 18, 19, T. 107. Examination of the phone led to more information,[8] and in turn, to search warrant applications for Good Voice's Facebook and Snapchat accounts. Ex. 20–23, T. 107-09. The federal magistrate judge found that probable cause existed and granted the corresponding warrants. T. 108–09.

After Good Voice's indictment, he moved to suppress (1) statements made during and after his arrest and (2) evidence obtained from his phone and social media accounts. Docs. 48, 53. The government opposed those motions. Docs. 50, 57.

United States Magistrate Judge Mark A. Moreno held an evidentiary hearing and issued a Report and Recommendation recommending that Good Voice's Motions to Suppress be denied.

---

[7] During the original March 2 interview, A.D. said Good Voice had done this with his phone on about five different occasions. Exs. A, B at 54, 18 at 5.

[8] Examination of the phone revealed images of child pornography from a known series, and two videos that appeared to be surreptitious recordings of two different women that follow up investigations revealed were made without their consent. T. 108.

Doc. 79. Good Voice filed objections to the Report and Recommendation. Doc. 81. For the reasons set forth below, and based on a full, de novo review of the files, motion hearing transcript and records, this Court adopts the Report and Recommendation, Doc. 79. Good Voice's Motions to Suppress, Docs. 48, 53, are denied.

## II. Standard of Review

In considering a magistrate judge's recommendation on a dispositive matter, such as a motion to suppress evidence, a district court must make a "de novo determination of those portions of the report or ... recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). A *de novo* review requires a district court to make its own determination of disputed issues. See United States v. Portmann, 207 F.3d 1032, 1033 (8th Cir. 2000).

## III. Discussion

### A. The Home

#### 1. Consent to Enter the Home

Good Voice asserts that the officers' warrantless entry into the house violated the Fourth Amendment to the United States Constitution and the statements he made following his arrest must be suppressed under the Exclusionary Rule to the Fourth Amendment and under Wong Sun v. United States, 371 U.S. 471, 484 (1963). Furthermore, Good Voice objects to the warrantless arrest inside the home under Payton v. New York, 445 U.S. 573, 586 (1980).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. amend IV. "It is a well-established constitutional principle that law enforcement officers may not enter a person's home without a warrant unless the entry is justified by exigent circumstances or the consent of the occupant." United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997); see also

7

Payton, 445 U.S. at 576 (stating the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest"). In Payton, the Supreme Court of the United States recognized that "no zone of privacy is more clearly defined than a person's home[.]" Conner, 127 F.3d at 666. This protection extends to temporary dwelling places. Id.

"While Payton did not deal with the issues of whether an initial consensual entry would justify a subsequent warrantless arrest, [the Eighth Circuit Court of Appeals has] held that a valid and voluntary consent may be followed by a warrantless in-home arrest." United States v. Briley, 726 F.2d 1301, 1303–04 (8th Cir. 1984) (cleaned up and citations omitted); see also United States v. Hampton, 260 F.3d 832, 835 (8th Cir. 2001) (finding that a defendant's in-home arrest "was constitutionally valid if he voluntarily and without coercion consented to the officers' entry").

Consent may be either express or implied. See United States v. Faler, 832 F.3d 849, 853 (8th Cir. 2016). Whether consent was voluntarily given to enter "is a question of fact to be determined from all the circumstances, and the government bears the burden of showing that the consent was freely given." Hampton, 260 F.3d at 835. "[T]he ultimate inquiry is not whether the defendant subjectively consented, but whether a reasonable officer would believe consent was given." United States v. Rodriguez, 834 F.3d 937, 940 (8th Cir. 2016) (citation omitted).

Good Voice objects to the Magistrate Judge's conclusion that he consented—either expressly or implicitly—to the entry of the home. Docs. 49, 81. Good Voice disputes the Report and Recommendation's findings of what Good Voice said when Dillon knocked on the door to the Sicangu Village home and made contact with him. Doc. 81. Contending the statement is ambiguous or if the Court determines the response to be a "no," Good Voice argues that such a negative answer meant that no consent was given. Doc. 49 at 2–3.

8

The body camera footage undermines Good Voice's argument by showing Good Voice stepping aside to allow the officers through the doorway and into the home after stating what appears to sound like "no" after being asked whether he minded if Dillon "came in for a minute." Ex. 6. That and subsequent interactions inside the home also appear to show Good Voice consenting to the officers' presence in the home, and Good Voice certainly did and said nothing to contest the officers remaining in the home. Ex. 6, 8. The Eighth Circuit has held that similar conduct amounts to implied consent. See e.g., Hampton, 260 F.3d at 835 (finding voluntary consent where record reflected that the defendant "literally opened the door to admit [police officers] into his home"); see also Rodriguez, 834 F.3d at 941 (finding an invitation to enter when, without words or protest, the defendant opened the door wider "and walked inside with his back to officers" after an officer asked to come inside); Faler, 832 F.3d at 853 (holding that stepping aside, after officers asked if they could come in, was implied consent); United States v. Greer, 607 F.3d 559, 563 (8th Cir. 2010) ("[W]hen [the defendant] opened the door to the porch and stepped back, he impliedly invited the officers to enter."); United States v. Turbvfill, 525 F.2d 57, 59 (8th Cir. 1975) ("[T]he action of [the defendant] in the opening of the door and stepping back constituted an implied invitation to enter."). The officers were reasonable in their belief that Good Voice consented to their entry.[9] Good Voice's consent, whether express or implied, was voluntary under the totality of the circumstances. See also United States v. Ortega-Montalvo, 850 F.3d 429,

---

[9] T. 61 ("Q. [D]id the Defendant say or do anything that made you think that he did not consent to you and Officer Cook waiting in the residence for Agent Tucker to arrive? (Plante): No[.]") T. 61 ("The way the word "no" was used was more – I felt invited, I mean, he stepped back -- ... held the door open for me, I took it as a come on in.").

433 (8th Cir. 2017) (examining the totality of the circumstances and finding voluntary consent to enter, based in part, on the consenter's prior criminal history[10]).

### 2. Consent to Search

Generally, law enforcement must obtain a warrant before entering or searching a home. See Steagald v. United States, 451 U.S. 204, 211–12 (1981). Probable cause does not entitle officers to arrest someone within their home without a warrant, but there are two limited exceptions: 1) when police face exigent circumstances, see Payton, 445 U.S. at 590, and 2) when police have received consent from someone with authority to provide it, see Hampton, 260 F.3d at 835. Consent can be provided by the principal or a third-party such an individual possessing authority over the premises, see Georgia v. Randolph, 547 U.S. 103, 109 (2006); Illinois v. Rodriguez, 497 U.S. 177, 181 (1990), homeowner, see Fernandez v. California, 571 U.S. 292, 298–99 (2014), or a fellow occupant who shares common authority over the property with another person, see United States v. Matlock, 415 U.S. 164, 170 (1974); United States v. Story, No. 3:20-CR-30088-RAL, 2021 WL 1423378, at *2 (D.S.D. Apr. 15, 2021).

Good Voice objected at the suppression hearing, T. 64–69, on hearsay and Confrontation Clause grounds, to the testimony and evidence which the government relied upon to show that Searby provided voluntary consent to search the home. Doc. 81. Rather than calling Searby to the stand, the government had an FBI Agent testify that the consent he received from Searby was voluntary. Doc. 81. Thus, the question is whether Searby needed to testify at the suppression hearing to prove she voluntarily consented to the search of her home.

---

[10] Good Voice in a separate case had recently been acquitted of aggravated sexual abuse by a jury in October 2020, and thus had some familiarity with the criminal justice system. See United States v. Good Voice, 3:20-CR-30019.

The Sixth Amendment states that in "all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause thus "bars the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." United States v. Johnson, 688 F.3d 494, 504 (8th Cir. 2012) (cleaned up and citation omitted). While there is no comprehensive definition of "testimonial," the Supreme Court of the United States stated in Crawford v. Washington that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. 36, 68 (2004); see also United States v. Waldron, No. CR. 07-50025, 2007 WL 2080520, at *4–6 (D.S.D. July 17, 2007) (rejecting Confrontation Clause and hearsay challenges to the admission of transcripts at suppression hearing but stating that the defendant could renew objections at trial if witnesses did not testify).

Several courts have held that the Confrontation Clause as described in Crawford applies only to trial and "the trial court may accept hearsay evidence at a suppression hearing if the court is satisfied that the statements were made and that there is nothing to raise serious doubt about their truthfulness." United States v. Boyce, 797 F.2d 691, 693 (8th Cir. 1986); see also United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); United States v. Perrin, No. CR 09-40052, 2009 WL 4906874, at *5 n.5 (D.S.D. Dec. 17, 2009), aff'd, 659 F.3d 718 (8th Cir. 2011) (rejecting a hearsay challenge at a suppression hearing when the court held documents were authenticated); Washburn v. United States, No. 303–CR–1701, 2006 WL 3715393, at *4 (N.D. Ind. Dec. 14, 2006), aff'd, 248 F. App'x 731 (7th Cir. 2007) ("[C]ases decided after [Crawford] reaffirm the admissibility of hearsay statements at suppression hearings."). This

11

is supported by the Federal Rules of Evidence and various cases and other authority.  See Fed. R. Evid. 104(a), 1101(d)(1); Matlock, 415 U.S. at173–74.

Here, the government laid the foundation for Searby's signature consenting to the search by asking Carlson to explain how he obtained it.  T. 64–68, 77.  Good Voice has not offered any evidence to contest the voluntariness of Searby's consent.  Indeed, it was Searby who helped initiate the investigation by taking the alleged victims to the hospital when they reported being sexually assaulted by Good Voice and then transporting them to Pierre for the assessment at CSDCAC, which at a minimum suggests that she was cooperating with the investigation despite her incredulity that Good Voice would commit such offenses.[11]  In addition to consenting to the search of her home, Searby consented to and provided a buccal DNA sample.  T. 64–65.  Good Voice's Confrontation Clause right was not violated by having an FBI agent testify at the suppression hearing about Searby giving consent to search her home.

Good Voice also contends he was removed from the premises to prevent him from objecting to a search.  Doc. 49 at 6.  While one person's consent to search a jointly occupied home is generally sufficient to justify a warrantless entry, there is a narrow exception to this rule.  If an inhabitant is physically present, he may expressly refuse consent to a police entry into the residence, regardless of the consent of a fellow occupant.  See Randolph, 547 U.S. at 122–23.  This narrow exception is limited to situations in which the objecting occupant is present.  See Fernandez, 571 U.S. at 301.  Thus, the complaining occupant must be personally present unless "there is evidence that the police have removed [him or her] from the entrance for the sake of avoiding possible objection."  Id. at 302 (cleaned up and citation omitted).

---

[11] This Court notes that Searby initially refused consent to Plante because of something he reportedly said before Carlson ultimately obtained the consent.  T. 64–68, 77.

Here, Searby, who was the homeowner, provided valid third-party consent to search the premises. The police testified that Good Voice was removed from the residence because they had probable cause to make an arrest, and Good Voice offers no evidence that he was removed explicitly to search the home.  T. 18–19, 38.  Thus, Good Voice's objections concerning the propriety of the search of the home are overruled.

Next, Good Voice argues that the consent obtained from Searby was overbroad because the FBI used a general consent to search form without providing any limitation on the scope of the search or the items to be seized.  Doc. 81.  However, that is exactly the type of search to which Searby consented.[12]  Besides, most of the items seized were within a shared bedroom or other communal areas in the home for which Searby had authority to consent to search.[13]  See United States v. Amratiel, 622 F.3d 914, 916 (8th Cir. 2010) ("[O]ne spouse presumptively has authority to consent to a search of all areas of the homestead." (cleaned up and citation omitted)).  For the above stated reasons, all of Good Voice's objections to the home search are overruled.

### 3. Fruit of the poisonous tree

Good Voice moves for suppression of statements and evidence, including the alleged telephone calls between Good Voice and others while at the RSTACF, as fruits of the poisonous tree under Wong Sun, 371 U.S. at 484.  Doc. 49.  Good Voice relies on the arguments made in his motion and memorandum to suppress, and objects to the Magistrate Judge's rejection of these arguments in the Report and Recommendation.  Docs. 49, 81.  He argues "but for" the illegal arrest, he would not have been jailed and thus would not have made any recorded telephone calls.

[12] T. 68 ("Q: Did she say anything when you met with her that in any way limited the scope of the search that you were striving to do?" [Carlson] "No.")
[13] The cell phone was seized in Searby and Good Voice's shared bedroom.  T. 76–77.  The police also seized tissue that they suspected may contain blood and laundry.  T. 96–98, Ex. 12, 13.

13

Doc. 49 at 5. The government counters that even assuming the arrest was made illegally, the telephone recordings made at the RSTACF should not be suppressed as they had been cured of any poisonous taint. Doc. 50 at 9–10. As previously discussed, Good Voice's arrest was proper because officers had sufficient consent to enter the premises and probable cause that a crime had been committed to make an arrest. Thus, statements Good Voice made in custody to third parties are not subject to being suppressed.

Even if Good Voice's arrest was somehow illegal, the telephone recordings would not be suppressed. "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." United States v. Yousif, 308 F.3d 820, 832 (8th Cir. 2002) (cleaned up and citation omitted). "To break the causal chain between an illegal arrest and a statement given later, the statement must be sufficiently an act of free will to purge the primary taint." United States v. Vega-Rico, 417 F.3d 976, 979 (8th Cir. 2005) (cleaned up and citations omitted). Courts consider factors such as "*Miranda* warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." Id.

Good Voice was not induced into making the phone calls based on any nefarious police misconduct. The communications were made, unprompted by law enforcement, to third parties. He had the presence of mind to refuse to speak with law enforcement after his arrest without an attorney present, T. 33, 98, and has prior experience with law enforcement and legal court proceedings due to a prior indictment which had proceeded to a jury trial. See Doc 5 in USA v. Conrad Good Voice, Jr, Case No.: 3:20-CR-30019. Such factors would tend to show Good Voice made these statements in telephone calls based on his own free will and weigh against exclusion.

14

Additionally, "[i]f someone agrees that the police may listen to his conversations and may record them, all reasonable expectation of privacy is lost, and there is no legitimate reason to think that the recordings, like any other evidence lawfully discovered, would not be admissible." United States v. Eggleston, 165 F.3d 624, 626 (8th Cir. 1999). It is likely, though not entirely clear, that Good Voice received such a warning,[14] putting Good Voice on notice of the possibility his communications were being recorded. With such a warning, any statements made in the taped prison telephone calls would be an act of free will, cured of any poisonous taint from an illegal arrest and thus not subject to the exclusionary rule. See e.g., United States v. Horr, 963 F.2d 1124, 1126 (8th Cir. 1992) (finding the defendant impliedly consented to the taping of his telephone conversations when he was on notice that they would be recorded); United States v. Lucas, 499 F.3d 769, 780 (8th Cir. 2007) (finding implied consent to recordings of prison phone call when the defendant was on notice that the calls were recorded from placards posted in the corrections facility and an audio warning before calls); United States v. Morin, 437 F.3d 777, 780 (8th Cir. 2006) (finding implied consent to recording phone calls when signs were posted and the defendant had been given handbook with warnings that calls would be monitored). Good Voice's objection to not suppressing the recorded phone calls is overruled.

## B. Warrants

### 1. The Phone

---

[14] T. 130 ("Q: What's your understanding about what inmates at those facilities are told about their calls or text messages being subject to monitoring?

[Plante] I'm -- I understand that they are usually -- there's like a playback that tells them that the conversation is being recorded.

[Defendant]: Your Honor, I'm going to object. I'm going to object on grounds of confrontation because number one, he hasn't identified what -- what jail he's referring to this playback for; and number two, unless he's heard it himself, he's testifying to hearsay.

[THE COURT:] Well, he's talking about usually and generalities, not necessarily as to specific facilities that Mr. Good Voice was at. Objection is overruled.")

Good Voice objects to the Magistrate Judge's factual findings and recommendation denying the motion to suppress the evidence taken from his cell phone. Doc. 81 at 4. Good Voice asserts that the affidavit for the search warrant on the cell phone was lacking probable cause to justify its issuance because the affidavit inaccurately characterized A.D.'s response as to whether she believed Good Voice took any photos or videos of the assaults. Ex. 18. Good Voice points to the last sentence of paragraph 13 of the affidavit, but context being important, it is quoted here in its entirety:

> During A.D.'s forensic interview on March 2, 2021, A.D. disclosed that the incidents with Conrad began about two years ago. On March 9, 2021, A.D. was further forensically interviewed at the CSDCAC in Pierre, South Dakota. A.D. disclosed that Conrad would be on top of her on the bed before he would grab a black phone, a phone that kind of looked like an Iphone, from a charger, turn on the flashlight, and look at her private part. Conrad held the phone while on his knees, and A.D. did not know why he used the flashlight. A.D. further disclosed that after using the phone a little bit he would put the phone back on the charger and continue being on top of her. A.D. disclosed that this happened on approximately five different occasions. According to A.D., she did not think Conrad was taking pictures or videos with the phone because she did not hear a clicking sound.

Ex. 18 at 5 ¶ 13.

The Fourth Amendment demands that a search warrant be supported by probable cause. United States v. Stevens, 530 F.3d 714, 717–18 (8th Cir. 2008). "Probable cause exists when a practical, common-sense inquiry that considers the totality of the circumstances set forth in the information before the issuing judge yields a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 718 (cleaned up and citations omitted). Great deference should be afforded the issuing judge, and the search warrant "should be upheld if the judge had a substantial basis for concluding that a search would uncover evidence of wrongdoing." Id. (cleaned up and citation omitted). "[C]ourts should not invalidate [a] warrant by construing the affidavit" supporting the warrant "in a hypertechnical" manner. United States v. Ventresca, 380

16

U.S. 102, 109 (1965). Rather, the "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." United States v. Daigle, 947 F.3d 1076, 1081 (8th Cir. 2020) (cleaned up and citation omitted).

"A search warrant is void and the resulting evidence must be suppressed, however, if the defendant proves by a preponderance of the evidence that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit and the affidavit does not establish probable cause without the false statement." Stevens, 530 F.3d at 718. "An affiant knowingly and intentionally or recklessly includes a false statement if he in fact entertains serious doubts as to the truth of the affidavit or has obvious reasons to doubt the accuracy of the information contained therein." Id. (cleaned up and citation omitted). Negligent or innocent mistakes resulting in inaccurate statements are insufficient to trigger relief. Id.

Here, Good Voice uses an inapt analogy to argue that the officer writing the warrant wrongly equated a negative answer by A.D. to "I don't think so." Doc. 81. A.D., who was nine years old, was asked whether she thought Good Voice took photos or videos and responded "hm-mmm" (negative). Exs. 16, 17 at 7, T. 101. When asked why she thought that way, she said that she did not hear the "clicking sound" she associated with the taking of a photo. Exs. 16, 17 at 7, T. 101. So, the officer writing the warrant accurately characterized her response as she "did not think [Good Voice] was taking pictures or videos with the phone because she did not hear a clicking sound." Ex. 18 at 5 ¶ 13. After all, being the subject of the recording rather than the creator limits her actual knowledge of whether child pornography was produced.

Good Voice places much emphasis on the ability of a nine-year old to discern whether her alleged perpetrator was creating child pornography while simultaneously raping her, as if her response can conclusively end the inquiry. But as was explained during the suppression hearing,

interviewers are trained to ask follow-up questions to determine why the alleged victim did not think images or videos were created. T. 101. It was during that exchange that A.D. revealed information suggesting Good Voice was using his cell phone in a manner that would be consistent with the creation of child pornography—i.e., describing Good Voice interrupting the sexual assault to grab his phone off a charger and the flash of the light behind her directed at her private parts that could be consistent with the flash of a camera. T. 100–101.

Read in full, the affidavit adequately summarized information provided by A.D. about whether she thought Good Voice took video or pictures and how, from her perspective, Good Voice used the phone during the alleged sexual abuse. The affidavit does not include A.D.'s verbatim responses given during her forensic interviews, but it does not mislead, hide or recklessly misrepresent her responses either.

Further, as explained in the Magistrate Judge's Report and Recommendation, the rest of the affidavit included information that solidified a finding of probable cause for a warrant to search the phone. Doc. 79 at 19. Plante provided an overview of A.D. and A.K.'s statements at IHS and during their CSDCAC interviews where they described Good Voice engaging in sex acts with them in the house. Ex. 18 at 3-5, ¶¶ 7–10, 13; see Daigle, 947 F.3d at 1082 (finding an affidavit established probable cause when it contained statements from the victim during the forensic interview that the author of the affidavit also observed); see also United States v. Brackett, 846 F.3d 987, 992–93 (8th Cir. 2017) (finding probable cause to search a residence for evidence of child pornography where an affidavit included information from the victim that the defendant engaged in sexual acts with her and took nude photos of her). Plante related that he and Tucker located a black phone, with Good Voice's name on it, in plain sight in a bedroom Searby and Good Voice shared, and that Searby had confirmed the phone belonged to Good Voice. Ex. 18 at 4-5,

12, ¶¶ at 13, 15.  Plante also stated that based on his own knowledge and experience, cellular phones could contain information or communications related to the sexual abuse offenses.  Ex. 18 at 5–6, ¶¶ 16–18. See United States v. Green, 954 F.3d 1119, 1123 (8th Cir. 2020) (finding probable cause to search a cell phone based, in part, on an officer's experience in child pornography cases); United States v. Stults, 575 F.3d 834, 843–44 (8th Cir. 2009) (finding probable cause to search files on a defendant's computer based in part on an officer's experience in child pornography cases).

Good Voice further asserts that the lack of evidence that he allegedly took photos or videos results in the lack of probable cause to issue the search warrant. Doc. 81.  However, as explained above, A.D.'s response that Good Voice would shine his phone's flashlight on her private parts during alleged acts of sexual assault supports a finding of probable cause that evidence of criminal activity existed on the phone.  A practical, common-sense inquiry considering the totality of the circumstances supports the issuing judge's decision that there was a substantial basis that evidence of a crime would be found on the cell phone and therefore suppression of the evidence seized on the cellphone is denied.

### 2. Snapchat and Facebook search warrants

Good Voice objects to the Magistrate Judge's factual findings and recommendation denying his motion to suppress certain information contained within his Snapchat and Facebook[15]

---

[15] Good Voice acknowledges that the arguments to suppress the Facebook communications are the same as to suppress the Snapchat communications, so this Court will address them together and note where different analysis applies.  Doc. 81 at 6.  Both search warrants contained the same information identifying the account in Attachment A, listing the spectrum of information to be seized in Attachment B, Section I, and then contained within Section II the restriction to all information described in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1153 and 2241(c), for the period of February 1, 2021, through March 16, 2021. Ex. 21, 23.

accounts because the FBI agent's affidavit and the resulting search warrants issued by the Magistrate Judge lacked particularity and were overly broad. Docs. 54, 81 at 5. Good Voice has not asserted that the affidavits submitted to obtain the warrants failed to establish probable cause to search Good Voice's social media accounts for at least some communications. However, Good Voice asserts that the only probable cause set forth in the affidavit was to search the Snapchat and Facebook logs relating to communications between Good Voice and Searby, not the entirety of his Snapchat or Facebook accounts including communications Good Voice had with others. Docs. 54 at 3–5, 81 at 5–7. Good Voice moved to suppress all Snapchat and Facebook communications under the exclusionary rule, citing Murray v. United States, 487 U.S. 533, 536 (1988), or at least those outside the temporal limitations of the search warrants, being periods between February 1, 2021, through March 16, 2021. Docs. 54 at 4, 81 at 6.

The Fourth Amendment requires that warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "To satisfy the particularity requirement of the Fourth Amendment, the items to be seized and the places to be searched must be described with sufficient particularity as to enable the searcher to locate and identify the places and items with reasonable effort and to avoid mistakenly searching the wrong places or seizing the wrong items." United States v. Gleich, 397 F.3d 608, 611 (8th Cir. 2005). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999). Therefore, courts consider the totality of the circumstances to determine whether there was probable cause sufficient to support the breadth of a warrant. United States v. Hernandez, No. 09 CR 625 (HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010); Illinois v. Gates, 462 U.S. 213, 238–39 (1983). Courts should evaluate the sufficiency of a search warrant affidavit "using a common sense and not a

hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (cleaned up and citations omitted). "A warrant naming only a generic class of items may suffice if the individual goods to be seized cannot be more precisely identified at the time that the warrant is issued." Horn, 187 F.3d at 788. However, a warrant that encourages general, exploratory rummaging is not allowed. See Anderson v. Maryland, 427 U.S. 463, 480 (1976).

Various courts have commented on the dangers to privacy presented by social media applications that capture a wide variety of sensitive data in an often precise manner. See, e.g., United States v. Ulbricht, 858 F.3d 71, 99 (2d Cir. 2017), overruled on other grounds by Carpenter v. United States, 138 S. Ct. 2206 (2018) ("A general search of electronic data is an especially potent threat to privacy because hard drives and e-mail accounts may be akin to a residence in terms of the scope and quantity of private information [they] may contain." (cleaned up and citations omitted)); United States v. Shipp, 392 F. Supp. 3d 300, 308 (E.D.N.Y. 2019) ("Facebook is designed to replicate, record, and facilitate personal, familial, social, professional, and financial activity and networks. Users not only voluntarily entrust information concerning just about every aspect of their lives to the service, but Facebook also proactively collects and aggregates information about its users and non-users in ways that we are only just beginning to understand.").

In United States v. Burkhow, the district court considered the different approaches courts have taken when analyzing the breadth of a warrant to search an individual's social media accounts. No. 19-CR-59-CJW-MAR, 2020 WL 589536, at *9 (N.D. Iowa Feb. 6, 2020). It outlined that "[s]ome courts have held that a warrant to search a defendant's social media account is not overbroad if it particularly describes the information to be disclosed and the offense being investigated." Id. (listing cases). "Such decisions emphasize that the mere fact that a warrant calls for a broad seizure of items does not alone dictate that the warrant is overbroad." Id. Other courts

21

"have held that it is not enough that the warrant makes reference to a particular offense; the warrant must ensure that the search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." Id. (listing cases including United States v. Irving, 347 F. Supp. 3d 615, 624 (D. Kan. 2018)).  Courts have further "noted that warrants for social media accounts should be tailored in time or to relevant persons to prevent a general rummaging." Id.  Ultimately, the Burkhow court stated that "[t]he mere fact that the government could not determine when the alleged criminal conduct began does not justify a search without any temporal limitations." Id. at *10. Yet it acknowledged "setting reasonable temporal limitations can be difficult and varies based on the specific facts of each case." Id.

Good Voice cites to United States v. Irving for the contention that a search warrant for an entire social media account, in that case Facebook, is overbroad: "the warrant must ensure that the search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." 347 F. Supp. 3d at 623; Doc. 81 at 5.  In Irving, the warrant contained no temporal limitation, unlike the warrants approved to search Good Voice's social media accounts.  Irving, 347 F. Supp. 3d at 623–24; Doc. 57 at 4-5.

The government argues that the search warrants for Good Voice's social media accounts contained specific limitations: 1) the evidence to be seized was particularly described and limited to evidence of violations of 18 U.S.C. §§ 1153 and 2241(c) aggravated sexual abuse of a child; and 2) the warrants set a temporal limitation, specifically for the period of February 1, 2021, through March 16, 2021.  Doc. 57 at 4, Ex. 21 at 6, 23 at 5.

What makes this case unique is that Snapchat provided more data than requested.[16]  Doc. 54 at 4.  Good Voice has a legitimate argument that communications that were provided beyond the scope of what was particularly described and outside the temporal limitations should be suppressed under the Irving decision.  However, this Court ultimately adopts the Report and Recommendation's reasoning that the limiting language in the warrants satisfies the particularity requirement established by Eighth Circuit precedent, which focuses on whether the offense being investigated was sufficiently identified in the warrant.  Doc. 79 at 22; See United States v. Sherman, 372 F. App'x 668, 676 (8th Cir. 2010) (holding a warrant tying information sought to specific crimes was not overbroad); United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008) (holding a warrant containing "a specific limitation" that was tailored to items relevant to charge was not overbroad);  Gleich, 397 F.3d at 612 (holding that warrants satisfied the particularity requirement because language in them limited the search to "items specifically prohibited by statute"); see also United States v. Jones, No. 19-CR341, 2021 WL 1321270, at **11–12 (D. Minn. Jan. 7, 2021) (holding a warrant authorizing search of a Facebook account was not overbroad and finding that the Eighth Circuit honors limiting language similar to language in Good Voice's case); United States v. Harris, No. 20-CR-98 (SRN/TNL), 2021 WL 4847832, at *6 (D. Minn. July 16, 2021), report and recommendation adopted, No. 20-CR-98 (SRN/TNL), 2021 WL 3929270 (D. Minn. Sept. 2, 2021) (finding that the focus of the Eighth Circuit is whether the offense being investigated was sufficiently identified in the warrant).  Under these cases, the search warrants for

---

[16] Good Voice states that communications from Snapchat were provided as far back as March 2019.  Doc. 54 at 4.  Courts have commented on the difficulties of establishing a temporal limitation which will vary based on the complexities of the case.  Burkhow, No. 19-CR-59-CJW-MAR, 2020 WL 589536, at *9 ("The extent to which a search can be limited, however, turns greatly on the posture of the investigation at issue.").  Although the search warrant specified a limited window, between February 1, 2021 and March 16, 2021, it is worth noting that A.D. had alleged the abuse had been going on for two years.

Good Voice's Snapchat and Facebook accounts were sufficiently limited in scope and breadth to comply with the Fourth Amendment. See United States v. Young, No. 21-CR-00098-BLW, 2021 WL 5889526, at **2–4 (D. Idaho Dec. 13, 2021) (holding that probable cause existed for the issuance of a warrant to search a Snapchat account and the warrant was not overbroad); United States v. Woods, No. 17-CR-103V, 2019 WL 7630758, at ** 2–5 (W.D.N.Y. Aug. 30, 2019), report and recommendation adopted, No. 17-CR-103-V, 2019 WL 5781859 (W.D.N.Y. Nov. 6, 2019) (holding a warrant to search a Snapchat account was sufficiently particular to comply with Fourth Amendment). Of course, merely because this Court denies a suppression motion does not thereby render the Snapchat evidence admissible.

Good Voice also argues that seizing any communications beyond those between himself and Searby would be overbroad in regards to the aggravated sexual abuse charges as listed in the indictment. Doc. 54 at 4, Doc. 81. Other conversations, Good Voice asserts, are beyond the permissible scope of the search warrant. Doc. 81 at 6. However, information contained within social media accounts that may not seem relevant on face to an investigation into sexual abuse may nevertheless be reasonably within the limits of the search warrant, for example, by identifying a defendant's locations at specific dates and times within a period of criminal activity. See Jones, No. 19-CR-341 (NEB/LIB), 2021 WL 1321270, at *11–12 (rejecting an overbroad challenge to suppress Facebook data which included locations related to specific dates). Additionally, it was reasonable that the search warrants would uncover messages within the accounts that had been deleted or altered after the investigation had been initiated. Just because the government could not anticipate the communications it encountered in the search, does not mean the warrants were deficient, especially when limited to a specific type of offense. The Eighth Circuit has stated that "[t]he failure of the warrant to anticipate the precise form in which [the sought information] would

appear is not fatal." United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995). Thus, this Court adopts the Report and Recommendation's finding regarding the legality of the search warrants that authorized law enforcement to receive information from Good Voice's Snapchat and Facebook accounts. Good Voice's objections to the Report and Recommendation regarding the social media accounts are overruled.

### 3. Leon Exception

Even if there is a defect in the warrant for social media accounts concerning particularity,[17] this Court agrees with the Report and Recommendation's analysis that the Leon good-faith reliance exception would apply and thus any evidence seized from the Snapchat and Facebook accounts is not subject to suppression. Good Voice asserts this Court should follow Irving to conclude that the Leon good faith exception is not applicable because the warrants were "so facially deficient that the executing officer could not reasonably believe [them] valid." Irving, 347 F. Supp. 3d at 625 (citation omitted). Good Voice notes that the same officer who executed the search warrant in the present case was the same one who prepared the affidavit, a fact identical to Irving, where the affidavit was deemed lacking in good faith. Id. For the same reasons described in Irving, Good Voice asserts that the good faith exception is not applicable because the officer should have been aware that the search warrants would amount to general rummaging.

The Fourth Amendment does not expressly preclude the use of improperly obtained evidence, which spawned the creation of the good-faith exception to the exclusionary rule. United States v. Leon, 468 U.S. 897, 906 (1984). "Under the good-faith exception, evidence seized

---

[17] The Leon "good-faith exception applies to the assertion that the warrant was overbroad with the same force and effect as it does to the assertion that the warrant lacked probable cause." United States v. Stephen, No. 18-CR-31-CJW, 2018 WL 4839065, at *12 (N.D. Iowa Oct. 4, 2018) aff'd, 984 F.3d 625 (8th Cir. 2021).

pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." United States v. Perry, 531 F.3d 662, 665 (8th Cir. 2008). "The operative test is whether a reasonably well trained officer would have known that the search was illegal." United States v. Mayweather, 993 F.3d 1035, 1041 (8th Cir. 2021) (cleaned up and citation omitted). This is because the purpose of the exclusionary rule is to deter police misconduct. See United States v. Simpkins, 914 F.2d 1054, 1058 (8th Cir. 1990). The rule is "based on the theory that where there has been no police illegality, there is no conduct the courts need to deter and therefore no basis to enforce the exclusionary rule." Conner, 127 F.3d at 667. "As the Supreme Court stated: Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. (cleaned up and citation omitted). Thus, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner . . . ." Messerschmidt v. Millender, 565 U.S. 535, 546 (2012). However, if "the officers' pre-warrant conduct is clearly illegal, the good-faith exception does not apply." Conner, 127 F.3d at 667 (cleaned up and citation omitted).

Thus, in general, "an officer cannot be expected to question a magistrate's probable cause determination," Leon, 468 U.S. at 921; however, Leon outlines four situations where an officer's reliance on a warrant would be unreasonable:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable;* and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

United States v. Proell, 485 F.3d 427, 431 (8th Cir. 2007) (cleaned up and citation omitted).  None of those situations apply in Good Voice's case.  As discussed, the affidavit did not contain any false statements and the issuing judge had probable cause to issue the warrants subject to the limitations provided.  Finally, the warrants were not so facially deficient that no reasonable officer could rely upon them.

It was this last area that the Irving court used to find a lack of good faith.  In Irving, the search warrant requested virtually all information contained within a Facebook account when the crime being investigated (failure to register a social media account) required only limited information.  Irving, 347 F. Supp. 3d at 624.  The search warrants at issue here are not so expansive; the search warrants limited the information sought to evidence of aggravated sexual abuse which could include communications to others besides Searby and set forth a temporal limit, which the search warrant in Irving did not.  The Irving court stated, "the affidavit indicates the broad view that the officer took of the search warrant. There does not appear to be an objective reason that the officer should have believed that this general rummaging would be permitted." Id. at 625.  Here, the officers by applying for warrants limited to an investigation into violations of aggravated sexual abuse within a reasonable temporal limit attempted to narrow their inquiry in good faith. Snapchat providing more information than requested does not equate to governmental misconduct or general rummaging that requires suppression.  Moreover, Irving seems to follow the line of cases requiring a greater degree of specificity than what is required in the Eighth Circuit to satisfy the particularity requirement.

Morever, many courts have found that "good faith is often present despite the overbreadth of a warrant to search a social media profile." Burkhow, No. 19-CR-59-CJW-MAR, 2020 WL 589536, at *11 (listing cases finding good faith despite particularity concerns regarding social

media accounts); see also United States v. Mize, No. 1:18-CR-74, 2020 WL 5505793, at *5 (S.D. Ohio Sept 11, 2020) (cleaned up and citations omitted) (finding an emerging pattern of cases across the country holding "search warrants that ask for an entire copy of a Facebook account . . . are likely overbroad, but evidence obtained therefrom is still admissible under the Leon good-faith exception); Shipp, 392 F. Supp. 3d at 312 (finding reliance on a warrant for Facebook data by law enforcement officers was not objectively unreasonable). This Court does not believe that the purpose of the exclusionary rule, to deter police misconduct, would be furthered by suppression under these circumstances. See Burkhow, No. 19-CR-59-CJW-MAR, 2020 WL 589536, at *12. The police identified the account to be searched, the evidence to be seized was particularly described and limited to violations of aggravated sexual abuse of a child, and the search warrants set temporal limitations. This differs vastly in scope than the type of general search the Irving court warned lacked good faith and the Fourth Amendment forbids.

Therefore, even if the search into Good Voice's social media accounts was overbroad, law enforcement relied upon the issuing judge's warrants in good faith and thus evidence seized from Good Voice's Snapchat and Facebook accounts are not subject to suppression. Good Voice's objections to the contrary are overruled.

**IV. Conclusion**

For the foregoing reasons, it is hereby

ORDERED that Good Voice's Objections to the Report and Recommendation, Doc. 81, are overruled. It is further

ORDERED that the Report and Recommendation for Disposition of Motions to Suppress, Doc. 79, is adopted. It is finally

ORDERED that Good Voice's Motions to Suppress, Docs. 48, 53, are denied.

28

DATED this 9th day of May, 2022.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE